PETTIGREW, J.
laThis matter involves a family-owned limited liability company (LLC) that was formed in 2002, and later dissolved in 2009, by Rufñn Leon Bergeron, Jr. (RLB), the initial managing member. Over four years after the dissolution, the plaintiff, Mary Beth Andersen (Ms. Andersen), one of RLB’s six children and a member of the LLC, filed a petition for declaratory judgment seeking to have the dissolution of the LLC declared null and void; to order that certain property that had been transferred from the LLC to RLB, allegedly in violation of the LLC operating agreement, be transferred back to the LLC; and to order that the LLC be reinstated. However, during the trial on the matter, the district court granted a motion for involuntary dismissal of Ms. Andersen’s claims and signed a judgment to that effect on Oeto-ber 13, 2015. Ms. Andersen, as plaintiff, and Gregory Bergeron, as third-party defendant/defendant in reconvention, jointly appeal that judgment.
FACTUAL BACKGROUND
On November 12, -2002, RLB formed Lone Oak Farm, LLC, a company he envisioned for himself and his six children— Ms. Andersen, Gregory G. Bergeron, Paul D. Bergeron, Leah Ann Bergeron Jones, Michael Bergeron, and Amy Claire Ber-geron Lindsly. One of RLB’s children, Michael, opted out of participation in the business. On November 14, 2002, RLB executed the Articles of Organization of Lone Oak Farm, LLC, designating himself as the initial managing member. On that same date, RLB, together with five of the children (excluding Michael) and a son-in-law, James A. Andersen, executed the Operating Agreement for the company.[4]
• By two separate acts of transfer, executed on October 31, 2003, and on March 10, 2005, RLB contributed certain immovable and movable property that he owned to the LLC. These acts were signed by RLB in his individual capacity as the transferor and in his representative capacity as the manager of the LLC. No other capital contributions to the company were made,
LSometime in 2009, RLB approached the members of the LLC to discuss adding his son, Michael, as a member of the company, or alternatively, creating a new limited liability company that would include Michael. When some members of the company expressed disagreement and refused to allow Michael to be added as a member, RLB told the members that he was going to dissolve the company. By two acts of transfer executed by RLB alone, in his individual capacity and in his representa *1252 tive capacity as the managing member of the LLC, on November 9, 2009, and on December 11, 2009, the immovable and movable property that had been transferred to the LLC by RLB were transferred back to RLB by the LLC. The November 9, 2009 transfer of immovable property contained specific property descriptions followed by a provision stating that the described property was “the same property” acquired by the LLC from RLB as his capital contributions on October 31, 2003, and March 10, 2005. That act also provided that it was made without any consideration and was accepted by RLB as a charge against his capital interest in the company.
Also, on December 11, 2009, RLB, acting under the authority of La. R.S. 12:1335.1, executed an Affidavit of Dissolution of Lone Oak Farm, LLC, representing that he, and no one else, held all membership interests in the company, and that the company was no longer doing business and had no debts. RLB sought to have the LLC dissolved by execution of the affidavit. The Secretary of State issued a Certificate of Dissolution, which was filed and recorded in the public records on December 18, 2009.
Approximately two and a half years later, on April 26, 2012, the notary public before whom the November 9, 2009 transfer of immovable property by the LLC to RLB was passed, Ralph B. Chustz (Mr. Chustz), executed a notarial act of correction pursuant to La. R.S. 35:2.1, stating that he made a clerical error in that act of transfer. He attested that the purpose and intention of the November 9, 2009 transfer was for Lone Oak Farm, LLC to convey back to RLB all of the immovable property it owned, but through a clerical error made by him, the act erroneously contained a section entitled “Less and Except” under which two lots of property that were intended to be transferred to RLB were erroneously listed, appearing to be excepted from the transfer. The act of correction lfichanged the description of the property conveyed in 2009 from 15 acres to approximately 160 acres. Shortly thereafter, RLB died on July 4, 2012.
PROCEDURAL BACKGROUND
Almost two years after RLB’s death, on April 11, 2014, Ms. Andersen filed the aforementioned petition for declaratory judgment in which she sought to have the dissolution declared invalid and the LLC reinstated, the 2009 transfers of property declared invalid and the property returned to the LLC, and the 2012 act of correction by Mr. Chustz declared null. The petition named as defendants the “Succession of Ruffin Leon Bergeron, Jr.,” through its independent executor, Gregory G. Berger-on, “and In His Capacity as Secretary of State, the State of Louisiana.” Gregory G. Bergeron, in his capacity as executor of the defendant, Succession of RLB, filed an answer to the petition. We note that service was requested on both, Gregory G. Bergeron, and Tom Schedler, in his capacity as Secretary of State, thus clarifying the intended name of the defendant in the petition.[5] The Secretary of State did not appear throughout the litigation and, given the ultimate findings by the district court, is not involved or implicated in the final judgment.
Although the Succession of RLB was also named as a defendant, there are, likewise, no allegations directed at the succession. The record reflects that at the time this litigation began, the succession of RLB was under judicial administration in the 18th Judicial District Court. RLB’s last will and testament was filed in that suit record by Mr. Chustz, who prepared and *1253 notarized the document. After certain individual bequests, the testament bequeaths RLB’s residual estate to all six of his children, to be shared equally. At that time, RLB’s residual estate included the property that is the subject of the act of transfer that the plaintiff seeks to invalidate. That testament named Gregory Ber-geron as executor, and he was appointed as such in the succession proceedings. The parties indicate that a motion was filed in the succession proceeding to remove Gregory Bergeron Ras executor and that he resigned as executor on April 8, 2014, (Ms. Andersen’s petition naming the succession as a defendant in this matter was filed three days later, on April 11, 2014.)
A petition for intervention opposing Ms. Andersen’s demands was filed on behalf of the true defendants implicated by Ms. Andersen’s allegations, “intervenors,” Paul D. Bergeron and Leah Bergeron Jones (members of the LLC), and Michael Bergeron, the child of RLB who had declined participation in the company. The intervenors also filed an answer including affirmative defenses and a reconventional demand.
As plaintiffs in reconvention, the interve-nors asserted the act of correction was valid and that RLB had authority to transfer property from the LLC back to himself and to dissolve the company. Further, in the alternative, should the court find RLB acted without authority, the intervenors alleged that RLB’s actions were approved and/or ratified by a majority of the members of the LLC, thus, validating the dissolution and RLB’s actions in transferring property from the company back to himself.[6] Finally, in the alternative, should the court find the dissolution was invalid, the intervenors sought to have the LLC judicially dissolved. At the end of the pleading, intervenors assumed the role of third-party plaintiffs, naming as third-party defendants, Gregory Bergeron, individually and in his capacity as executor of the estate of RLB, and Amy Claire Bergeron Lindsly, and reasserted all of the claims alleged in the reconventional demand against them as well. Ms. Andersen and Gregory Ber-geron filed a joint pleading in answer and opposition to the petition of intervention, the reconventional demand, and the third-party demand.[7]
|7On April 10, 2015, a trial of the matter began. The plaintiff presented the testimony of Ms. Andersen and Gregory Bergeron, the parties jointly introduced several exhibits, and plaintiff rested. The defendants/intervenors then moved for a directed verdict.[8] A discussion was held at *1254 the bench, and a decision was reached to allow the defendants to put on a couple of witnesses, so that the district court, in ruling on the motion, would have sufficient evidence from which to resolve all of the issues presented by plaintiffs case: whether RLB had the authority to- execute the November 9, 2009 act of transfer; whether the notarial act .of correction executed by Mr. Chustz was valid and effective; and whether the dissolution of the LLC was invalid such that it should be reinstated.[9]
The defendants/intervenors elicited the testimony of Mr. Chustz, who had served as RLB’s attorney since 2004, and was the attorney who drafted and notarized most of the documents relevant to the issues raised in this matter, and executed the notarial act of correction at issue. The defendants/intervenors also presented the testimony of James A. Laurent, Jr., who took office as the tax assessor for Pointe Coupee Parish in January 2010, with regard to tax notices sent on some of the property at issue. After the defendants/in-tervenors re-urged their motion for directed verdict, the trial was recessed for briefing, and the district court took the motion for directed verdict under advisement.
ACTION BY THE DISTRICT COURT
On September 15, 2015, the trial resumed for argument and a ruling from the court on the defendants/intervenors’ motion for directed verdict. After hearing arguments hfrom all parties, the district court found that the clear language of the Articles of Organization and, apparently, the operating agreement granted RLB, as the initial sole manager of the LLC, the authority to act unilaterally on behalf of the company. Therefore, RLB had the authority to transfer immovable property on behalf of the LLC without obtaining the consent of any other member. As such, the district court held the November 9, 2009 act of transfer was valid. Further, the district court found the error made in the act of transfer, which was later corrected by the act of correction executed by Mr. Chustz, was a clerical error and that the act of correction was the proper and valid channel by which to correct such an error. Finally, the district court, having found that the transfer of all immovable property out of the LLC was valid and that the LLC was validly dissolved, declined to reinstate the LLC. The plaintiff, Ms. Andersen, joined by defendant in reconvention, Gregory Bergeron (hereinafter referred- to as appellants), appeal that judgment.
ASSIGNMENTS OF ERROR
Appellants assign error to all three of the district court’s findings: (1) in deciding that RLB had authority to transfer the LLC property to himself without the consent of the LLC membership, when the transfer was violative of the operating agreement and the statutory fiduciary duty provisions; (2) in determining the act of transfer contained a clerical error and that the notarial act of correction was val *1255 id; and (3) in refusing to reinstate the LLC, which was improperly dissolved.
STANDARD OF REVIEW
The district court’s grant of an involuntary dismissal is subject to the manifest error standard of review. Accordingly, in order to reverse, we must find, after reviewing the record, that there is no factual basis for its finding or that the finding is clearly wrong or manifestly erroneous. The issue is not whether the trial court was right or wrong, but whether its conclusion was reasonable. Broussard v. Voorhies, 2006-2306 (La.App. 1 Cir. 9/19/07), 970 So.2d 1038, 1041-42, writ denied. 2007-2052 (La. 12/14/07), 970 So.2d 535.
I aRLB’S AUTHORITY TO ACT ON BEHALF OF THE LLC
RLB acted alone in executing the Articles of Organization of Lone Oak Farm, LLC on November 14, 2002. In those Articles, RLB designated himself as the “initial Managing Member of the Company” and provided that all “[p]ersons dealing with the Company may rely upon a certificate issued by [RLB] to establish the membership status of any member, the authenticity of any records of the Company, and/or the authority of any person designated to act for the Company, including but not limited to the authority to take action as specified in [La. R.S. 12:1318(B)].” That same provision authorized third parties to conclusively rely on the authority given to RLB. Notably, these Articles contain the following statement: “The said Ruffin L. Bergeron, Jr. is authorized to sell, partition, donate, encumber, mortgage, lease[,] or otherwise deal with immovable property of the company ivithout further authorization from, the members of the company.” (Emphasis added.) RLB also executed the “Initial Report” of the company, again, designating himself as the first managing member and the company’s registered agent. This report further listed RLB and his five participating children and one son-in-law (Ms. Andersen’s husband) as first members. The Articles of Organization, read alone, clearly grant RLB the authority to transfer property out of the LLC without approval from other LLC members.
On the same day the Articles of Organization were executed, RLB and the aforementioned six other members executed and signed an Operating Agreement for the LLC. This agreement, again, designated RLB as the initial managing member and provided that all third parties (“[a]ny person or firm dealing with this company”) could rely on the capacity and authority of RLB, as managing member, “to act for the company in any banking transactions, sale, mortgage, lease[,] or other transaction involving assets or property owned by the company until such time as said person is relieved of his duties ....” (Emphasis added.)
The agreement also divided the ownership of the LLC into three separate classes, with each class owning one third of the company. An attachment to the agreement lists the classes and the ownership interest of each class as follows: Class I consisted of one | inmember, RLB, with one hundred (100%) percent ownership of that class. Class II consisted of Ms. Andersen, with forty-eight (48%) percent, her husband, James Andersen, with two (2%) percent, and Gregory G. Bergeron, with fifty (50%) percent ownership of that class. Class III members, each with one third ownership of the class, were Paul D. Ber-geron, Leah Ann Bergeron Jones, and Amy Claire Bergeron Lindsly. The agreement further specified that Class I members would receive ninety-five (95%) percent of the profits and losses of the LLC; Class II members would share, by percentage of ownership in said class, two *1256 (2%) percent of the profits and losses; and Class III would share, by percentage of ownership in the class, three (3%) percent of the profits and losses;
Notably, the Operating Agreement, in paragraph VIII, in pertinent part, provides that “[w]ritten authorization of the membership shall be necessary to sell, lease, mortgage, or otherwise deal with immovable property of the company.” Additionally, paragraph XIV, provides the following:
All actions requiring a vote of the membership shall be decided by a majority vote of individual members and by member classes, with voting among member classes to be based upon each member’s ownership percentage of said class. For example, a vote to sell immovable property will require a majority vote of all members of the company as well as a majority vote among each of the three membership classes
[[Image here]]
(Emphasis added.)
The district court had before it the preliminary issue of the validity of the November 9, 2009 act of transfer. The resolution of this issue turns on whether RLB had the authority in acting alone to transfer the LLC property back to himself. Whether RLB had the authority to act alone is determined from the authority vested in the LLC members pursuant to its Articles of Organization and its Operating Agreement.
The district court granted the motion for involuntary dismissal finding as follows:
First of all, did Mr. R. L. Bergeron have the authority to transfer property from the L.L.C.? I think from the Articles of Organization, he absolutely maintained that right for himself. That was always his intention, this is my property, y’all should be glad to get whatever I give y’all. That was always his intention. Whatever I decide to give you guys, you just be glad with it. I think that was his desire at all times.
|nThe court’s reasons for concluding that RLB acted within the authority vested in him by the relevant documents do not reflect the legal analysis undertaken, which as shown below, involves contract interpretation, and a conclusion regarding whether the documents are in conflict, and if so, the resolution of that conflict. In reviewing the correctness of the district court’s conclusion, we undertake that analysis.
Are the Articles of Organization and the Operating Agreement in Conflict?
In determining the extent of RLB’s authority regarding the transfer of immovable property from the LLC as set forth in the applicable documents, we must apply general principles of contract interpretation. Contracts have the effect of law for the parties and the interpretation of a contract is the determination of the common intent of the parties. La. C.C. arts. 1983 and 2045; Marin v. Exxon Mobil Corp., 2009-2368 (La. 10/19/10), 48 So.3d 234, 258. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. Prejean v. Guillory, 2010-0740 (La. 7/2/10), 38 So.3d 274, 279 (per curiam.) When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. Common intent is determined, therefore, in accordance with the general, ordinary, plain, and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a con *1257 tract into harmony with a supposed reasonable intention of the parties. Prejean, 38 So.3d at 279.
However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract “must be interpreted in a commonsense fashion, according to the words of the contract their common and usual significance.” Id. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. La. C.C. 1 iaart. 2049. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050; Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 2012-2055 (La. 3/19/13), 112 So.3d 187, 192.
The defendants/intervenors maintain that the documents, when read together, are not in conflict and establish that RLB had the authority to execute the transfer of property. According to the defendants/intervenors’ argument, Article III of the Articles of Organization, and Article II of the Operating Agreement, grant to RLB, and RLB only, the unilateral and unlimited authority to “deal' with” the property of the LLC without requiring authorization or consent from anyone else. According to the defendants/intervenors, these two provisions are not in conflict with Articles VIII and XIV of the Operating Agreement. According to the defendants/intervenors, the language in Articles VIII and XIV address the authority of a non-specific manager, is., a manager other than RLB, and those actions require approval by a majority vote of the membership. The defendants/intervenors maintain this is the only interpretation that gives meaning to all the provisions according to the clear language in each. To read the provisions otherwise, defendants/interve-nors argue, renders meaningless the otherwise clear language of the Articles of Organization granting the sole authority to RLB in dealing with property belonging to the company, and Article II of the Operating Agreement, reasserting this grant of authority to act alone, vested in RLB as the managing member of the LLC.
In the alternative, the defendants/inter-venors lastly argue that if conflict exists between the documents, then the rules of contract interpretation require a search for the intent of the parties and giving each provision meaning, which they maintain leads to the same conclusions—that RLB had the authority to transfer property alone, and the act of transfer is valid.
The appellants agree that the two provisions are not in conflict vis a vis the authority vested in the LLC members. The appellants argue that the provision in the Articles of Organization containing language clearly providing that RLB may' act alone in all things representing the LLC applies to RLB’s authority to act on behalf of the LLC as to \ mthird parties. However, the appellants argue that the authority of the members of the LLC vis a vis one another is just as clearly provided in the Operating Agreement to require a vote of a majority of the members in each class, as well as a majority of the classes. Thus, they argue that RLB did not have the authority to act alone, in transferring immovable property from the LLC without first obtaining.a vote of the members.
After reviewing the language of the documents only, we tend to agree with the defendants/intervenors that, when read together, the documents are not in conflict. The language in the Articles of Organization, which was executed by RLB alone, very clearly depicts RLB as the managing *1258 member and indisputably vests in RLB the authority to act alone without the approval or consent of any other members. This document must be read together with the Operating Agreement that was signed by all the members of the LLC. Article II of the Operating Agreement, much like Article III of the Articles of Organization, grants to RLB, as the sole managing member, the unilateral authority to “deal with” the property of the company without requiring approval or consent from any of the other members. Articles VIII and XIV of the Operating Agreement require a majority vote of the membership to approve any transaction involving company property and assets by a manager. While these provisions do not expressly provide that these provisions apply only when the manager taking company action is someone other than RLB, any other reading of these provisions would render meaningless the otherwise very clear vesting of authority in RLB to act alone as initial managing member. We are required by La. C.C. art. 2050 to interpret each contractual provision in light of the other provisions in order to arrive at the meaning of the contract as a whole. When read together, we find that meaning can be given to all provisions of both documents without the two being in conflict. Considering that the Operating Agreement was drafted for the specific purpose of delineating the obligations, duties, and powers of all the members of the LLC, it is rational to read the provisions of that agreement in light of the authority already otherwise granted to only the initial managing member. In this light, it becomes clear that the provision requiring a majority vote of all the members applies to transactions other than those taken by RLB in his sole capacity, ie., when those | ^transactions are undertaken by any member other than RLB. This interpretation renders all provisions of both documents meaningful and valid. As noted earlier, any other interpretation would simply eliminate the effect of the two provisions granting RLB full and unilateral authority to act on behalf of a company over which he is the initial and managing member. This result complies with the requisite standards for contract interpretation and does not yield an absurd result. Thus, based on our review, we do not find the provisions of the Articles of Organization and the Operating Agreement to be in conflict, and also And that together, they grant RLB the authority to act alone in all dealings concerning the LLC, including transfers of immovable property,
However, only in the alternative, we also find that, even if the provisions were in conflict, and a resort to determining the parties’ intent is necessary, the result would be the same. The record in its entirety supports a conclusion that all interested parties knew and/or had the understanding that RLB had the authority, and indeed acted upon such, to “deal with” the LLC and its assets as he saw fit, without the approval or consent of the other members. It was known by all that RLB was the only member who contributed any capital assets to the company. It is also undisputed that there were other transactions concerning the LLC that RLB undertook by himself, without the approval, consent, or even knowledge of the other members; and no objections to any of those transactions was ever raised by any of the members. Indeed, until RLB met with the members concerning his desire to add Michael as a member, the members had never had any formal meetings or votes concerning any of the business of the LLC conducted unilaterally by RLB. Moreover, both of the appellants testified that RLB “pretty much” did whatever he wanted to do with his property, and that no one considered themselves to be in a position to stop. him. Although *1259 Ms. Andersen testified that she did not believe RLB could take the property back without the consent of the members, she agreed with everyone else that RLB stated his clear intention to take all of the property back from the LLC and dissolve the company when he could not get the members to agree to allow Michael into the company, and no one did anything to stop him from doing so.
| Additionally, the record contains evidence that the members knew that the act of transfer had taken place, and they acted in accordance with that knowledge. Gregory Bergeron testified that he continued to receive lease payments on some of the relevant property, and he testified that he deposited those funds into RLB’s personal accounts, instead of to the LLC account where they had previously been deposited. The record also contains Mr. Laurent’s testimony that the 2010 tax rolls showed the property at issue as belonging to the LLC. However, once the tax notices on the property went out, he was contacted by RLB and informed that the property no longer belonged to the LLC but rather to RLB, and asked that the notices be sent accordingly. Mr, Laurent testified that at that point, his research revealed the act of transfer and that he changed the tax rolls accordingly. Again, no other member of the LLC objected in any way to the tax notices being changed and sent to RLB rather than the LLC.
The record as a whole very clearly reveals that RLB’s intent and expectations when he initially formed the company was to keep all of the property he owned within the family after his passing. He did not want it divided or used for other purposes. Despite a long standing history of animosity among the children, to the point of not communicating, he always wished for all of his six children, two that he had with one wife, and four with another wife, to co-own and continue to use the property. He attempted to do so with the initial set up of the LLC, but was unable to convince his son Michael to be named as a member. When RLB subsequently met with the other members seeking to have Michael added as a member, and some refused, he immediately told them that he was going to dissolve the company. In keeping with his wishes, (as much as possible, given- the disagreement among his children), after dissolving the LLC and regaining ownership of the property he had transferred to the LLC, RLB promptly executed a will and testament leaving all of his property equally to all of his children. Thus, the initial set up of the LLC, as well as its dissolution, were both separate attempts by RLB to achieve his only intended result—to leave all of his property, equally, and undivided, to all six of his children. When he was unable to achieve this result by use of the LLC (due to the refusal of some of the members to accept Michael as a member), he did so by dissolving the LLC lir.and executing a last will and testament that would come closer to achieving his initial, and only, goal with regard to the property at issue. ■
It is also worth noting that RLB acted very openly and directly concerning his actions and intent in transferring the property out of and dissolving the LLC. No one has alleged that RLB acted with deception or that he misrepresented or attempted to hide any of his actions. All interested parties knew what he was doing at all times, and no one did anything to object or inhibit RLB’s actions. Indeed, as noted earlier, the members conducted themselves as though they accepted all acts taken by RLB concerning the LLC. Although Ms. Andersen and Gregory testified that they did not object or attempt to thwart their father’s actions in any way because he was in poor health and they did not want to cause him any upset or anxiety, they nonetheless did nothing for at least two years *1260 after RLB’s death in July 2012, even when RLB would have been unaffected by any legal challenges they raised. Instead, the petition in this matter was not filed until 2014, when the succession was opened and the will and testament was introduced.
Accordingly, and in the alternative only, if the documents are considered to be in conflict, a resort to determining the true intent and understanding of the parties yields the same result—that RLB believed, and no one voiced any objection, that he had the authority to act alone in dealing with the LLC, and that the steps he took in doing so were valid and enforceable. Thus, the district court did not err in construing the contractual provisions consistent with the parties’ intent as revealed by the record as a whole. We find no merit to this assignment of error.
VALIDITY OF NOTARIAL ACT OF CORRECTION
The appellants also attack the validity of the notarial act of correction executed by Mr. Chustz on April 26, 2012, purporting to correct a clerical error Mr. Chustz admits to making when drafting the November 9, 2009 act of transfer through which RLB transferred the immovable property he had contributed to the LLC back to himself. Appellants maintain that the error was substantive rather than clerical, rendering the transfer invalid. Appellants assign error to the district court’s finding that the correction |17was clerical in nature and, thereby, rendering the act of correction valid and applicable to the transfer of the property in accordance with the November 9, 2009 act of transfer.
Mr. Chustz drafted the act of transfer for RLB, and he also executed the notarial act of correction that is now at issue. According to Mr. Chustz, his review of the LLC documents yielded an understanding that RLB had the authority to handle the property that was titled in the name of the LLC however he saw fit. Mr. Chustz testified that RLB contacted him in November 2009 wanting to withdraw all property that he (RLB) had placed into the LLC out of it and put back into his name. When asked in court whether the act of transfer accomplished RLB’s request, Mr. Chustz stated that it did not, as a result of the inclusion of some “less and except” language in the transfer document that was not meant to be included, which Mr. Chustz admitted “was clearly [his] error.” That provision was inadvertently included in the transfer document, the effect of which would leave property in the LLC when RLB did not intend to retain any property in the LLC. According to Mr. Chustz, RLB’s intent was clear and unequivocal—he wanted all the property taken out of the LLC and returned back to him. Mr. Chustz noted the act of transfer contains another reflection of RLB’s clear intent by specifying that the property being transferred was the same property that RLB had placed into the LLC by two earlier acts at the inception of the company. Mr. Chustz also testified that per RLB’s instructions, he also drafted an act of transfer transferring all of the movable property in the LLC from the company back to RLB. Also per RLB’s instructions, once the acts of transfers were executed, Mr. Chustz also prepared an “Affidavit of Dissolution of Lone Oak Farm, LLC,” which was executed in his presence by RLB in the presence of two other witnesses in December 2009. Mr. Chustz testified that he would not have executed the dissolution document if he believed that the LLC still owned any property following the acts of transfer.
Mr. Chustz testified that in April 2012, approximately two years following the acts of transfer and dissolution of Lone Oak Farm, LLC, he became aware that the November 9, 2009 act of transfer erroneously excepted property that was intended to be, and should have been, included in *1261 the immovable property transferred from the LLC to RLB. h «Because at that time, RLB was in very poor declining health, in and out of a responsive state, and because the LLC had been dissolved, Mr. Chustz took it upon himself to execute a notarial act of correction as the means to accomplish RLB’s true intent with regard to the November 9, 2009 act of transfer. Mr. Chustz admitted in his testimony that it was through a meeting with Michael Ber-geron (regarding tax notices on the properties) that he became aware of the error he made in the act of transfer. However, Mr. Chustz maintained that Michael did not point out the error and had absolutely nothing to do with the drafting of the act of correction. Instead, Mr. Chustz testified that during conversation with Michael, he realized his own error in the act of transfer and he undertook the execution of the notarial act of correction for the sole purpose of accomplishing RLB’s stated intentions when he requested that Mr. Chustz draw up the transfer documents, as Mr. Chustz knew that RLB had relied on him to fully and properly describe the property being transferred.
Applicable Law
Affidavits to correct notarial acts affecting immovable property are allowed pursuant to La. R.S. 35:2.1, which provides, in pertinent part:
A. (1) A clerical error in a notarial act affecting movable or immovable property or any other rights, corporeal or incorporeal, may be corrected by an act of correction executed by any of the following:
(a) The person who was the notary or one of the notaries before whom the act was passed.
(b) The notary who actually prepared the act containing the error.
B. The act of correction executed in compliance with this Section shall be given retroactive effect to the date of recordation of the original act. However, the act of correction shall not prejudice the rights acquired by any third person before the act of correction is recorded where the third person reasonably relied on the original act. The act of correction shall not alter the true agreement and intent of the parties.
(Emphasis added.)
11flBecause the issue involves the applicability of La. R.S. 35:2.1 as well as the interpretation of “clerical error,” it invokes a question of law that is reviewed by this court under a de novo standard of review. First National Bank, USA v. DDS Construction, LLC, 2011-1418 (La. 1/24/12), 91 So.3d 944, 952. The statute does not define “clerical error,” and a review of the jurisprudence reflects a case-by-case interpretation in accordance with the particular facts presented, yielding an array of examples of mistakes made in the transfer of immovable property that can be considered as “clerical error” within the scope of the statute allowing the correction of such.
As noted by the bankruptcy court for the Western District of Louisiana in In re Huber Oil of Louisiana, Inc., 311 B.R. 440 (Bankr. W.D. La. 2004), the fact that the statute contains the term “clerical error” as opposed to simply “error” indicates that it was not intended to encompass every error that could occur, and the courts must determine what differentiates a clerical error from some type of other error. 311 B.R. at 444. Black’s Law Dictionary (9th ed. 2009) defines “clerical error” as:
An error resulting from a minor mistake or inadvertence, esp. in writing or copying something on the record, and not from judicial reasoning or determination. Among the boundless examples of clerical errors are omitting an index from a document; typing an incorrect *1262 number; mistranscribing a word; and failing to log a call. A court can correct a clerical error at any time, even after judgment has been rendered.
The issue in Huber Oil was the validity of an act of correction purporting to correct a property description contained in a cash sale deed that differed from the description provided in the agreement to purchase and sell. Similar to the case before us, the discrepancy was that the cash deed sale contained an additional “less and except” provision which excluded certain property (“Omitted property”) from the transfer. 311 B.R. at 442. The Huber Oil court considered the Black’s Law definition above and took a “common sense approach” to the issue and concluded the statute was meant to apply to errors in writing or copying as opposed to an error arising from some reasoning, determination, or thought process. 311 B.R. at 444. Applying that conclusion, the court acknowledged that while the error was not necessarily a typographical error, the un-controverted evidence in the record clearly established that the error was one occurring |2nin the physical preparation of the documents and was not the result of any reasoning, determination, or thought process, noting “not one of the interested parties made a conscious and reasoned decision to exclude the Omitted Property from the transactions.” Id. The court found the Omitted Property was inadvertently included as a “less and except” provision that was not the result of any thought process nor intended; the sale contemplated the inclusion of the property at issue, and the act of correction was deemed valid. Id. Notably, the court rejected the argument that the additional “less and except” provision was added to the documents rather than deleted rendered the error “non-clerical” outside the scope of correcti-ble errors. The court found, “[w]ith the use of word processing programs which are currently used by the vast majority of attorneys, the court believes it is just as likely to inadvertently ‘paste’ a provision into a document as it is to ‘cut’ one.” Id.
In the instant case, we recognize that the error in the act of transfer appears to have had the effect of transferring only 15 acres, and excluding (“less and except”) approximately 145 acres from the transfer, leaving a substantial amount of property in the LLC that was intended to be returned to RLB. However, the jurisprudence renders clear that the substan-tiality of the error in terms of acreage, etc., is not the only factor in determining whether the error was clerical for purposes of being corrected by notarial act pursuant to La. R.S. 35:2.1. Rather, the determination hinges on the manner in which the error came about, whether it was the result of something contemplated and thought out, or whether it arose in the physical preparation of the documents; the latter type error falling within the scope of “clerical error” correctible pursuant to La. R.S. 35:2.1. Our de novo review of the record reveals that the error in this case was indeed clerical and correctible. Mr. Chustz testified that the request he received and what he intended to accomplish was an act of transfer whereby all of the immovable property in the LLC, which was transferred to the company by RLB, would be returned to RLB. Mr. Chustz also indicated that he made changes to previously existing documents to construct a transfer document that achieved RLB’s intended action. Mr. Chustz further testified that he later discovered what he considered to be an error on his part in preparing the act of |2itransfer which erroneously excepted property from the transfer that was certainly intended to comprise the property being transferred.
Similar to the finding by the Huber Oil court, it appears the error in this case may well have been the result of *1263 inadvertent “cut and paste” functions of a word processor, leaving in a document something that was never intended or contemplated. Moreover, elsewhere in the act of transfer is language reflecting the true intent of the transfer, to wit, to return to RLB all of the property that he had placed into the LLC. Appellants have cited numerous cases that reach a different result; however, we note, first, that the determination is made on a case-by-case basis and is reliant on the particular facts and circumstances of each case. Moreover, every case cited by the appellants is distinguishable in significant ways from the situation before us, and are simply not controlling. Based on the applicable law, the entire record before us, and the testimony presented related to this issue, we conclude that the error in the act of transfer was a clerical error, and the appropriate remedy was the execution of a notarial act of correction, pursuant to La. R.S. 35:2.1, which was done in this matter. Accordingly, we find the notarial act of correction to be proper and valid. We find no merit to this assignment of error.
DISSOLUTION/REINSTATEMENT OF LLC
The appellants maintain that the affidavit of dissolution of the company executed by RLB, and that formed the basis upon which the Secretary of State issued a certificate of dissolution, was invalid, and assign error to the district court’s refusal to reinstate the LLC. Dissolution of an LLC by affidavit is statutorily provided in La. R.S. 12:1335.1, in pertinent part as follows:
A. In addition to all other methods of dissolution, if a limited liability company is no longer doing business and owes no debts, it may be dissolved by filing an affidavit with the secretary of state executed by the members or by the organizer, if no membership interests have been issued, attesting to such facts and requesting that the limited liability company be dissolved. ...
B. The secretary of state shall reinstate a limited liability company that has been dissolved pursuant to this Section |22only upon receipt of an order issued by a court of competent jurisdiction directing him to do so.
The Secretary of State has already issued a dissolution of Lone Oak Farm, LLC, and the statute is clear that reinstatement of a dissolved company is not automatic, but must be court ordered. There is also no statutory provision entitling members of a company to reinstatement, even if the dissolution was improperly obtained. Therefore, the appellants’ arguments, concerning only the invalidity of the dissolution on the basis that RLB, in the affidavit upon which the dissolution was granted by the Secretary of State, misrepresented that he was the sole member of the company and that the company was no longer in business, are misplaced. Any alleged error or misrepresentation does not negate the effect of the dissolution. The issue at this juncture is not the validity of the dissolution, but rather whether the district court erred in refusing the appellants’ request for an order reinstating the LLC.
Notably, appellants present no argument concerning the district court’s refusal to reinstate the company; rather, they attack only the validity of the affidavit upon which the dissolution was granted. Otherwise, appellants’ challenge to the court’s refusal to grant the reinstatement is directly linked to their argument that the act of transfer was invalid. Indeed, if the act of transfer was deemed invalid, the determination of the appropriateness of granting reinstatement would differ substantially, in that the LLC would still own property. However, having found the transfer of the *1264 property from the LLC to RLB was valid, our review of the issue of reinstatement concerns an LLC that no longer owns property.
The above cited statute, La. R.S. 12:1335.1(B), does not address the circumstances under which a court may (or should) order reinstatement of a dissolved LLC. The statute is also silent regarding what supporting evidence is necessary and/or sufficient in order for a court to reinstate an LLC. See In re Reinstatement of CBG Inv. Group, L.L.C., 2009-2150 (La.App. 1 Cir. 6/3/10), 42 So.3d 429, 432. The jurisprudence on the issue is sparse; the majority of the reported cases address only the issue of the retroactivity, rather than the validity, of a court-ordered reinstatement. ^Nonetheless, a review of the existing jurisprudence reveals that our courts have determined that a company dissolved should be reinstated if there is a “practical or lawful necessity” for such. For example, in Butcher v. Keith Hebert Carpentry/Vinyl Siding, Inc., 2006-672 (La.App. 3 Cir. 12/20/06), 945 So.2d 914, 917, the third circuit held that reinstatement of a corporation was proper when, at the time of dissolution, there was pending litigation against the company and reinstatement was ordered to allow the corporation to resolve pending litigation instituted prior to the dissolution. See also, In re Reinstatement of Venture Associates, Inc. of Louisiana, 2004-0439 (La.App. 1 Cir. 2/11/05), 906 So.2d 498, 501, wherein this court held: “[w]e find the desire to maintain a pending lawsuit in a corporation’s name is a valid and lawful purpose for ordering the reinstatement of a corporation.”
As noted earlier, the appellants’ argument is premised on the alleged invalidity of the act of transfer. There was no other evidence presented that supports a finding that a lawful or practical purpose exists for reinstatement of the LLC in this matter. In addition to finding there was no property left in the LLC and that the LLC was no longer conducting business, the district court noted the long-standing intense discord that exists among RLB’s children in refusing to order reinstatement:
As far as the L.L.C., y’all will never get along, guys, and I feel sorry for y’all. I really do. Should the L.L.C. be reinstated? No. Y’all will never, ever see eye to eye and I feel sorry for y’all when it comes to that, I do. ... I don’t know what else to say, but I know what your dad intended. There is no doubt in my mind what he intended to do here.
The court further noted that all of the property at issue was included in the list of assets in RLB’s succession, to be divided equally among his six children. The court noted that the only effect of reinstating the LLC (assuming for the sake of argument that the act of transfer was invalid) would be that all of the property at issue would then be owned by the members of the LLC, to the exclusion of one of RLB’s children, Michael, which the court found to be directly against the intentions and wishes of RLB, who wished to leave his entire estate to his six children in the hopes of continuing a family legacy he created. I^When he could not achieve that through a family-held LLC, he dissolved the company, and instead, executed a will and testament to accomplish his wishes.
Our review of the record reveals no basis upon which a reinstatement of the LLC in this matter would be proper. There is no legal or practical purpose for its continuation, and there is no merit to this assignment of error.
CONCLUSION
For all of the foregoing reasons, we affirm the October 13, 2015 judgment of the district court that granted an involuntary dismissal of all of Mary Beth Ander *1265 sen’s claims with prejudice. All costs of this appeal are assessed to the appellants, Mary Beth Andersen and Gregory Berger-on.
AFFIRMED.
Calloway J. dissents and assigns reasons

. The details regarding the different classes of membership in the LLC are discussed later herein.

. This clerical error has never been addressed by an amendment to the pleadings, thus the incomplete caption of the case, as reflected in original petition, remains.

. In connection with this assertion, the inter-venors attached affidavits executed by Leah Bergeron Jones and Paul D. Bergeron, two Class III members of the LLC, in which each attested that had they been consulted by RLB regarding his intentions to transfer property from the LLC back to himself and to dissolve the company, they would have concurred with those intentions and voted to approve them.

. Despite the representations by the parties that Gregory resigned as executor of the succession on April 8, 2014, the record contains an answer to Ms. Andersen’s petition filed by Gregory Bergeron, as independent executor of the estate. In this answer, Gregory denied many of the allegations raised by Ms. Andersen concerning the validity of the act of transfer and the dissolution of the LLC, but in connection with those denials, he also stated that he personally agreed with the positions taken by Ms. Andersen in the petition, which positions he subsequently took as defendant in reconvention, and in arguing before the district court and joining Ms. Andersen as appellant in this matter.

.The record reflects that the defendants made a motion for a directed verdict, which is appropriate only in a jury trial. See La. C.C.P. art. 1810. Where the case is tried by a judge only, the appropriate remedy for dismissal of the case at this stage is a motion for involuntary dismissal. See La. C.C.P. art. 1672. A misdesignation of the pleading is an error of *1254 form over substance; we consider them both the same motion. Gillmer v. Parish Sterling Stuckey, 2009-0901 (La.App. 1 Cir. 12/23/09), 30 So.3d 782, 785 n.2.

. We recognize that the district court's allowing two of the defendants’ witnesses to testify before ruling on the defendants’ motion for involuntary dismissal is a novel departure from the clear language of La. C.C.P. art. 1672 that states, in part, "after the plaintiff has completed the presentation of his evidence;” thus, the motion is based and resolved upon the evidence presented only by the plaintiff's case. However, in this case, the record reveals a discussion was had following which the parties agreed to proceed with the presentation of some, but not all, of the defendants’ case. None of the parties objected or raised the issue on appeal. Accordingly, we consider it waived and analyze the propriety of the motion on the evidence presented.